Louis Greenspan [1] et al. v. Commissioner.
Greenspan v. Commissioner
Docket Nos. 26633,
26634.
United States Tax Court
1952 Tax Ct. Memo LEXIS 248; 11 T.C.M. (CCH) 402; T.C.M. (RIA) 52114; April 22, 1952
Martin S. Stolzoff, Esq., for the petitioners. William P. Flynn, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in income tax against each of the petitioners for 1945 in the amount of $2,193.97. The sole issue is whether the profit realized upon the sale of a parcel of unimproved real estate resulted in a capital gain or was ordinary income. The respondent has determined that the property was held primarily for sale to customers in the ordinary course of business. The petitioners contend that the property was held for investment and was a capital asset within the meaning of section 117 (a). In the alternative, they contend that the property constituted *249 real property used in the taxpayer's trade or business within the meaning of section 117 (j). The petitioners filed separate returns on a community property basis with the collector for the sixth district of California. Findings of Fact The petitioners, who are husband and wife, reside in Los Angeles, California. Since 1926, Louis Greenspan, hereinafter referred to as the petitioner, has been engaged in the general contracting, building, and real estate business. His activities in this business from 1926 to 1936 included the purchasing of lots, the construction of dwellings on those lots, and the sale of the dwellings and lots. From 1936 to 1945, the petitioner was interested in several enterprises, the business of which involved the purchase and sale of land and the building of houses for sale. Prior to 1945, the petitioner or his wife was a stockholder in the following corporations: Durabilt Homes Co., Bonded Homes Corporation, Harmony Homes, Inc., and Louis Schulman, Inc. The petitioner came to Los Angeles in 1939 and engaged in building houses. In 1942 he went to Detroit to pursue his business. He returned, in 1943, to Los Angeles where he intended to continue his construction *250 operations. However, war conditions brought about restrictions on the use of materials, and the petitioner was unable to obtain the preference ratings on the houses which he contemplated building. In 1944, the petitioner had about $150,000 available for working capital. In November, 1944, the petitioner purchased 77 acres of unimproved, nonsubdivided land from Del Fante for $110,000. He made a downpayment of $50,000 and executed a deed of trust securing his indebtedness for the remainder of the purchase price. The acreage comprised one-half of Lot 188, about 20 acres, and Lots 199 and 204, aggregating about 57 acres, in tract 1000 in the San Fernando Valley. The property was divided into two parcels by a street known as Riverside Drive with Lot 188 lying to the north thereof and Lots 199 and 204 to the south. It was bounded by Woodman Avenue on the west and by Sunnyslope Avenue on the east. The petitioner owned no other unimproved real estate during 1945. The property was situated in a section within the city of Los Angeles known as Sherman Oaks. It was an established community in 1945, having been developed in about 1920. Transportation facilities and shopping areas were readily *251 accessible from the petitioner's property. A school was situated nearby. When he purchased the property, the petitioner planned to develop and subdivide it and either sell lots for residential purposes or, after the war, build homes on the lots and sell the houses and lots. On November 24, 1944, the petitioner entered into an agreement with the Del Fantes to lease them the land for farming. Under the lease, the petitioner had the right to enter the property in order to show it to prospective purchasers and to carry on subdivision work. The lease could be terminated by either party upon giving 6 months notice. Part of the land was farmed during 1945. In November, 1944, the petitioner contemplated the subdivision of about 17 acres of his property lying south of Riverside Drive. He employed a civil engineer to prepare a map of a proposed subdivision of his entire property and authorized him to submit it to the Los Angeles City Planning Commission, hereinafter referred to as the Commission, for approval. Upon the advice of the engineer, the petitioner decided to include a subdivision of all the land in the map, because it was less costly to have all the preliminary work done at one *252 time and because the Commission was more likely to approve a map of this kind. On January 12, 1945, the Office of the City Engineer of Los Angeles recommended to the Commission that a map of the proposed subdivision be approved upon the fulfillment of certain specified conditions. The property could not be subdivided and the lots sold until the conditions were satisfied and plats were duly recorded. No plat with respect to the 20 acres of Lot 188 was ever recorded by the petitioner. The 20 acre parcel of land was situated adjacent to property used for a dairy farm and was not as desirable for residential purposes as the property located south of Riverside Drive. On April 26, 1945, the petitioner recorded a plat of a subdivision known as Tract 13075. The land included within the subdivision constituted the northwest section of Lots 199 and 204. It fronted Woodman Avenue on the west and Riverside Drive on the north. On the east and south the subdivision was adjacent to the remaining acreage in Lots 199 and 204. Plats pertaining to this remaining acreage were recorded by the petitioner on December 5, 1945. This subdivision, known as Tract 13525, abutted Riverside Drive on the north *253 and Sunnyslope Avenue on the east. In May, 1945, the petitioner was approached by Charles Keeshan, a real estate broker, in regard to the purchase of the 20 acres in Lot 188. Keeshan represented Ian Murray and associates who were interested in purchasing some acreage for subdivision. At first, the petitioner informed Keeshan that he was not interested in selling, because he intended to develop the land himself. After several weeks of negotiations, the petitioner and Keeshan reached an agreement. On May 22, 1945, the petitioner entered into escrow agreements with Murray and his associates pursuant to which Murray's group paid $1,000 and agreed to pay the balance of the purchase price of $45,000 by June 22, 1945. However, prior to June 22, 1945, Murray and his associates decided not to complete the transaction. Shortly thereafter, the petitioner was contacted by several representatives of Notre Dame University who wanted to acquire the land as a site for a high school. He agreed to sell the 20 acres of land to Notre Dame for the sum of $45,000. The sale was completed in July, 1945. Under the deed of trust which he had given the Del Fantes, the petitioner had reserved the right to *254 redeem at any time the 20 acres of land in Lot 188 from its encumbrance upon the payment of $25,000. The petitioner conducted the business of his real estate venture during 1945 under the name of Woodman Park Homes. He participated in no other business activity during 1945. He maintained an office in a shack on the property. A telephone was installed there and was listed in the classified section of the telephone directory under the name of Woodman Park Homes. On at least three occasions before May 22, 1945, the petitioner ran advertisements in the Valley Times, a newspaper circulated free of charge to about 62,000 residents in the San Fernando Valley, offering the 20 acres in Lot 188 for sale. A typical advertisement was as follows: 20 ACRES $50,000 Riverside, corner Woodman. Subdivision map approved. Excellent site for residential development. Sewer and water at property. Woodman Park Homes Owner 13650 Riverside Dr. St. 4-4957 Except for the 20 acres in Lot 188, the petitioner had not divided or platted his property in any other 20 acre sections. The petitioner did not list the 20 acres in Lot 188 with any real estate broker, nor did he use "for sale" signs to *255 advertise its availability for sale. He did not solicit offers from Murray or Notre Dame. The expense connected with the escrow agreements and the agent's commission were paid by the purchaser. No improvements were made on the property by the petitioner. Listings of the remainder of his property which he had subdivided as Tracts 13075 and 13525 were given to Keeshan by the petitioner. Keeshan sold a number of lots in Tract 13075 during the latter half of 1945 to home builders, for which he was paid a commission by the petitioner. The remainder of the lots were sold in subsequent years. The income realized from the sale of the subdivided lots is not involved in this proceeding. The petitioner is a licensed real estate broker. After 1945, he continued in the business of subdividing acreage, constructing homes, selling lots, and selling houses. The petitioner's return for 1945 shows that he realized a gain in the amount of $16,576.20 from the sale of the parcel of land in Lot 188. He treated the gain as a long-term capital gain, including 50 per cent, or $8,288.10, in his taxable income. His return shows, further, that he realized a net profit in the amount of $24,488.59 from the *256 business of Woodman Park Homes. Gross profits from the sale of lots were in the aggregate amount of $40,277.10; from the rental of land, $1,554.21; and from interest, $290.54. Business expense included, inter alia: advertising, $634.92; commissions paid, $6,325; and property taxes, $2,196.62. The petitioner acquired and held the 20 acres of land in Lot 188 for the same purpose as he did the land in Lots 199 and 204. From the time of acquisition, he held the 20 acre parcel of land primarily for sale to customers in the ordinary course of his real estate business. Upon the sale of the land in 1945, he realized ordinary, not capital gain. Opinion The question is whether the profit from the sale of 20 acres of unimproved acreage in 1945 by the petitioner is taxable as ordinary income or as capital gain. The petitioner contends that the 20 acres of unimproved acreage which he sold during the taxable year comes within the class of capital assets as defined by section 117 (a) (1) of the Code. In the alternative he contends that the land was "real property used in the trade or business" under section 117 (j). The respondent contends that the property involved was held primarily for *257 sale to customers in the ordinary course of the petitioner's business, and that, therefore, the gain realized from the sale of the property is not entitled to the favorable treatment accorded by sections 117 (a) (1) and (j). Whether a land sale results in ordinary or capital gain is a question of fact. (C.A. 9, 1936); Cf. (C.A. 9, 1939). Upon the petitioner lies the burden of proving that the property was not held primarily for sale in the ordinary course of his trade or business. In November, 1944, the petitioner purchased 77 acres of non-subdivided land. During 1945, he subdivided 57 acres of the land and sold some of the subdivided lots. He did not subdivide the remaining 20 acre parcel of land in Lot 188, but sold it as acreage during the taxable year. In his return for 1945, the petitioner treated the profits from the sale of the subdivided lots as ordinary income. He does not deny now the propriety of so reporting those gains. In fact, on brief he admits, and properly so we think, that he was engaged in the business of selling the subdivided lots. However, he takes *258 the position that the 20 acres of non-subdivided land was held by him as investment property and, therefore, that the profit from its sale should be treated differently than the gains derived from the sale of the subdivided lots. We do not so interpret the evidence. During 1945, the petitioner was not actively participating in any other business except that of selling real estate, and in that business the only realty which he had to sell were the lands which he had purchased the previous year. Under such circumstances, it does not seem reasonable that he intended to exclude from his business activities a 20 acre parcel of land, which comprised over 25 per cent of the total land owned by him. The petitioner's testimony shows that he purchased the property, including the 20 acre parcel, with the plan of developing and subdividing the land and selling lots. His operations also contemplated the building of houses on the property after subdivision. However, because he was able to sell the property in Lot 188 as acreage, the petitioner never carried out his subdivision program with respect to that parcel of land. Nevertheless, the sale was in conformity with the petitioner's purpose of *259 disposing of the property quickly for profit. The petitioner's intent not to hold the 20 acres in question as an investment is further demonstrated by the fact that he advertised the land for sale from time to time during May, 1945, before he entered into the agreement for its sale. We have no doubt that the newspaper advertisements introduced into evidence referred to the property here involved and to no other land. The petitioner stresses the fact that at first he told the agent for the purchaser that he did not want to sell the property. Even if we consider this declaration to have been something more than bargaining, motivated by a desire to obtain a better price, the testimony of the agent shows that the petitioner based his initial refusal to sell on the fact that he intended to develop and sell the property himself. We do not deny that a taxpayer may hold certain property in the ordinary course of his business and at the same time hold other property of the same class for investment. ; . However, such was not the case here. The evidence does not support the contention that the 20 *260 acre parcel was being held for investment. There is nothing in the evidence to show that the petitioner was holding the land, hoping for a rise in the market. Rather, the evidence shows a willingness to sell and a plan for the sale of the land at a profit. That the petitioner recorded subdivisions of and developed all of his land before selling it, except the 20 acres here involved, is not determinative or critical in decision of the issue. In , the taxpayers formed a syndicate to buy, subdivide, and sell certain real estate. As a condition to acquiring the land, they were required to purchase several other tracts of land which they considered undesirable and not readily salable. Without improving the undesirable tracts, the taxpayers sold several of them during the taxable year. This Court held that the land was not a capital asset but was held primarily for sale to customers in the ordinary course of business. See also . The factual situation in the instant proceedings is not essentially distinguishable from that in the Wibbelsman case. If anything, it is more adverse to the position *261 of the petitioner. While the 20 acres of land lying north of Riverside Drive being adjacent to a dairy farm may not have been as desirable or valuable for residential purposes as the property located south of Riverside Drive, the petitioner was not compelled to buy this land in order to obtain the other property. The fact that the petitioner sold only one parcel of non-subdivided land, consisting of 20 acres, does not alter its status as property held primarily for sale in the ordinary course of business. In the Wibbelsman case the taxpayers did not sell any subdivided lots during the taxable year but sold 7 parcels of non-subdivided tracts, aggregating about 5.6 acres, while in , the taxpayer sold 3 tracts of undeveloped land, consisting of 15 acres, to one purchaser. The sale of the acreage here was not a separate transaction isolated from the rest of the petitioner's real estate activities and business. It was a part of his program of selling his lands at a profit. Since the petitioner was a licensed real estate dealer, it was not unusual that he sold the land in question without employing an agent and paying a commission. Nor is the *262 fact that the purchaser of the property approached the petitioner without solicitation a factor which by itself is crucial. Cf. . The evidence shows that the property in question was not acquired and held as an investment and that it was not a capital asset. ; (C.A. 9, 1938); (C.A. 9, 1941), affirming ; (C.A. 5, 1944); (C.A. 5, 1949). There remains for consideration the petitioner's alternative contention. By leasing the land for farming purposes prior to its sale, the petitioner did not convert it into real property used in his business within the meaning of section 117 (j). The land was not acquired by the petitioner primarily for the purpose of deriving rental income therefrom. The lease arrangement covered all the lands purchased and under its terms the petitioner reserved the right to enter the property for the purpose of displaying it to prospective buyers. *263 The renting of property in order to realize income while awaiting the sale thereof does not establish that the property was held primarily for rental purposes. ; ; ; (C.A. 9, 1951). In our opinion, the evidence amply supports the respondent's determination that the 20 acre parcel of land was held no differently "from any of the rest of the land which the petitioner acquired" by purchase at the same time. The land in question was held primarily for sale to customers in the ordinary course of the petitioner's real estate business, and the proceeds from its sale are taxable as ordinary income. The respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. Consolidated with this proceeding is Belle Greenspan, Petitioner, Docket No. 26634.↩